## No. 10,624.

### CATTELL *v.* DENVER STATE BANK, ET AL. ..

Decided March 3, 1924.   Rehearing Denied April 7, 1924.

Action to recover money paid on stock subscription. Judgment for defendants.

#### *Affirmed.*

1. BANKS AND BANKING—*Stock Subscription—Status of Subscriber.*
   Plaintiff subscribed for five shares of a proposed increase in the capital stock of a bank. The increase was never authorized, but there was issued to him five shares of the original stock which he accepted and retained for a year and a half and until the bank failed. Held, that he was not entitled to a preferential claim for the money paid on the stock subscription, as against creditors and depositors, after the insolvency of the bank.

2. CONTRACTS—*Fraud—Remedies.* A party to a contract tainted with, and who is injured by fraud, has two remedies. He may affirm the contract and sue for damages, or he may disaffirm the contract and by rescission have it canceled.

3.  BANKS AND BANKING—*Stock Subscription—Status of Subscriber.* When a banking corporation becomes insolvent, the equities of general creditors, including depositors, who become such after the stock subscription was made, are superior to the rights of the subscriber, although the latter was induced to make his subscription by fraud which worked an injury to him.

4.  APPEAL AND ERROR—*Facts—Presumption.*  On review, it will be presumed that the trial court found such facts as the evidence tended to show.

*Error to the District Court of the City and County of Denver, Hon. Warren A. Haggott, Judge.*

Mr. JOHN A. RUSH, Mr. FOSTER CLINE, for plaintiff in error.

Mr. KENNETH W. ROBINSON, for defendants in error.

*Department Three.*

MR. JUSTICE CAMPBELL delivered the opinion of the court.

THE plaintiff in error, plaintiff below, on September 24, 1919, subscribed for five shares of a proposed increase of the capital stock of The Denver State Bank, one of the defendants in error, and a codefendant in the district court, and also here, with the state bank commissioner in possession after insolvency.  The written contract of subscription provides that the money received thereon, less the selling expense, shall be deposited under a special account in the bank to the credit of the subscriber until all of the proposed increase is subscribed and paid.  The proposed increase was never authorized and no "increase" stock was ever issued or paid for.  At the time of the subscription plaintiff paid on the agreed price, $250.00, and afterwards, in January 1920, $500.00, the balance due, a total sum of $750.00.  When the balance was paid the bank delivered to the plaintiff five shares of its capital stock, evidenced by certificate 115 of the old issue of $50,000.  From the time that plaintiff thus became a stockholder he held his stock and continued to act as a stockholder until and after the bank became insolvent and

passed into the hands of the state bank commissioner on July 19, 1921, a period of more than one and one-half years. At the time the commissioner took charge there was cash on hand of about $3,000. The indebtedness was about $150,000. The assets were not sufficient to pay the depositors more than 75 per cent of their claims. Of this total indebtedness over $50,000 were created in savings accounts alone after plaintiff purchased his stock, and approximately $25,000 in savings accounts were opened during the year 1921.

The plaintiff's claim is that under the subscription agreement the money paid by him, and which the bank received, became a trust fund and upon its insolvency passed to and was held by the commissioner in the same capacity in which the fund was held by the bank, that it never became a part of the assets of the bank, never was the property of the bank and was held by it merely as bailee, title remaining in the plaintiff.

The contention of the defendant is that after insolvency of the bank, under the state of facts above recited, the equities of depositors are superior to those of a stockholder, although the latter has been defrauded by the bank officers in foisting upon him old stock instead of a proposed increase stock which only he agreed to buy, and the plaintiff, by waiver and estoppel, may not now complain of the fraud, as against the commissioner and general creditors.

The discussion has taken a wide range, far beyond what is necessary in view of the decisions of this court and of our court of appeals. Assuming with the plaintiff—and it seems that the trial court so found—that the money which he paid on his subscription was received by the bank and under the contract the fund thereby created was a trust fund which thereafter came into the possession of the commissioner, and further assuming that had not the bank become insolvent the plaintiff might have recovered in an appropriate action of rescission or in a suit for damages at his election, still, under our previous decisions,

and by the weight of authority, after the insolvency of the bank the plaintiff was not entitled to a preferential claim as against the commissioner as the representative of the depositors and general creditors.

The plaintiff maintains that the present action is not one for rescission but is to enforce a trust agreement and, therefore, the doctrine of estoppel and laches interposed by the defendant is not applicable as it might be if the action was for rescission. A party to a contract tainted with, and who is injured by, fraud has two remedies. He may affirm the contract and sue for damages. He may disaffirm the contract and by rescission have it cancelled. He can not, however, have both remedies. If he rescinds he must rescind the contract in its entirety. If he affirms he must affirm wholly, not in part. He may not have in the one action relief that is appropriate only in the other. He may no more have in the one action two different and inconsistent kinds of relief than he may invoke at the same time inconsistent remedies. In this action plaintiff asks for judgment against the bank and the commissioner for the amount that he paid on his subscription, together with interest, and also that the bank be required to take back the certificate of stock he received and cancel it and relieve him from all the liabilities of a stockholder. It will be observed that plaintiff does not ask to have the trust agreement which he made, enforced. If that agreement was enforced, he would become a stockholder and be subjected to the liabilities of a stockholder, and that is evidently what he wishes to escape. Enforcement of the contract can not be had because the bank was never authorized to issue stock of a proposed increase, and no increase was ever made. Notwithstanding plaintiff apparently has sought to avail himself in the one action of inconsistent remedies and asks for inconsistent relief, and while it might be difficult to determine what is the real nature of the action, such a determination here is unnecessary for plaintiff is not entitled to any relief as against the commissioner or the depositors in any sort of an action.

In passing, however, we observe that, in the Eagleson Case hereinafter cited, this court said the action there, similar to this, was for rescission, and the stockholder there was defrauded as plaintiff is here.

Though there are some decisions of the inferior federal courts and of courts of some of our sister states to the contrary, it is the settled doctrine of the United States Supreme Court, and supported by the great weight of authority in this country, that when a corporation becomes insolvent the equities of general creditors, including depositors, who became such after a stock subscription was made, are superior to the rights of the subscriber, although the latter was induced to make his subscription by fraud which worked an injury to him. This case is governed by our decision in *Van Gilder v. Eagleson*, 66 Colo. 364, 181 Pac. 539. The court there, speaking through Mr. Justice Teller, said that the stockholder's rights were not only inferior to the rights of creditors, but that the plaintiff there was guilty of laches which took away his right of action, if he ever had any. The evidence here is that at least $25,000 in savings accounts were opened by the defendant bank during the year 1921, the first of which was opened more than a year after the plaintiff subscribed for his stock. When the certificate of old stock was issued to, and accepted by, plaintiff, he signed his name in the stub which recited that the five shares of stock therein included were part of a certificate of a larger number of shares standing in the name of one of the officers of the bank, and a part of the old stock. After the plaintiff received his stock certificate he attended at least one meeting of the stockholders. He had a checking account in the bank, depositing several times each week. During this time there was a printed statement hanging on the walls of the bank at the end of a desk used by the depositors, in clear view, announcing that the capital stock of the bank was $30,000 and that plaintiff was one of the stockholders. It was also in evidence that about ten days before the commissioner took possession officers of the

bank informed the plaintiff that it was in a bad condition, and he was told that if the stockholders would deposit securities in proportion to the value of their stock with the Denver Clearing House, a guaranty could be obtained for the depositors, and the bank could be kept a going concern, whereupon the plaintiff advanced securities, or put up collateral, to the value of $1,000, double the par value of his stock, to be used for that purpose, which were returned to the plaintiff as the proposed guaranty was abandoned.

This action was begun by the plaintiff December 14, 1921, nearly four months after the commissioner took possession. The evidence tended to show, and we must presume the trial court so found, that the plaintiff, by reason of waiver or estoppel or both—and each defense was pleaded by the defendants—in equity may not now be heard to say as against the commissioner that he was not a stockholder from the time the stock was delivered to and accepted by him. To say the least, the evidence tended to show, which the court might rightly find, that the plaintiff, even if not a stockholder as against the bank, had the same not become insolvent, was a stockholder from the time he received, without protest, the old stock, instead of the proposed new issue, and continued to hold it without objection so long as the bank kept open. As a matter of law, under the doctrine of the Eagleson Case, and as a matter of fact, upon the evidence produced, we can not say that the trial court was not justified upon both grounds in declaring that the plaintiff's equities are inferior to those of the depositors.

The Eagleson Case, which announces the true, and prevailing, doctrine, which we again affirm, requires that the judgment of the district court be, and it is, accordingly, affirmed.

MR. CHIEF JUSTICE TELLER and MR. JUSTICE SHEAFOR concur.